Our last case on the docket this afternoon is Huddleston v. Trame, 5-24-1120. Alan, if you're ready to proceed, you may do so. Please identify yourself for the record when you start. Thank you, your honors. May it please the court, my name is Thomas Magg. I represent Mr. Huddleston. This is a Second Amendment case. There's two primary issues in the case. It's a Second and Fifth Amendment case. Two primary issues are the Second Amendment and the Fifth Amendment. The first of the issues I'd like to address is the issue of the dismissal of the claim brought under the Second Amendment as it relates to my client's concealed carry license in light of a non-plenary order of protection. The order of protection was originally entered ex parte. The ex parte order expired under its own terms. The record shows that the order of protection case was ultimately dismissed without a new order of protection being entered. The result of my client's FOIA card, which of course the court is well aware, required to possess a firearm in the state of Illinois lawfully, as well as my client's concealed carry license, which the court is also likely well aware, is required to carry a firearm under most circumstances outside of the home in Illinois. As the FOIA card itself was restored before this case was filed, at least on appeal here, we're not discussing the FOIA card per se, but we are arguing as the case relates to the concealed carry license, as on the date that this case was filed, that had not yet been restored, in accordance with the Supreme Court's recent ruling on the issue of standing in the Davis case. So we have standing on concealed carry, we don't have standing on FOIA, so we're arguing concealed carry. The trial court dismissed, on summary judgment, the Second Amendment claims related to the concealed carry license by misapplying the Bruin standard. Bruin v. New York, New York v. Bruin, I always get confused on which goes first. It's the U.S. Supreme Court case, it's not the most recent, I think it's the second most recent U.S. Supreme Court case on the Second Amendment, the most recent being the Rahimi case, which will also be discussed. It makes clear that there is a two-part test analyzing Second Amendment cases. The first test is whether or not the plain language of the Second Amendment protects the conduct at issue. This is the first point that the trial court aired. The plain language of the Second Amendment protects the right of the people to keep and bear arms. It doesn't say the right of judges to keep and bear arms, the right of the Army to keep and bear arms, the right of this group or that group. The trial court, for purposes of its first mistake on this point, said, well, the plain language doesn't say it protects the right of persons with orders of protection to keep and bear arms. And in doing that, the trial court conflated the first prong and the second prong. The first prong, my client is a citizen of the United States. He has a clean criminal record. He has never been convicted of anything that I'm aware of. And yet his right to carry a concealed firearm in accordance with his clearly established constitutional rights was abridged by this order of protection. Therefore, we believe that the trial court aired on the first prong of Bruin. That takes us to the second prong of Bruin. And that is whether or not there is a traditional standard or a traditional history of applying restrictions of that type in the United States. And it's our contention that the appropriate time frame is at the time of the revolution. Case law is in some dispute on how far forward and back. Some courts have applied Reconstruction era. But I believe that the time of the revolution is the appropriate standard. Notwithstanding that the 14th Amendment, of course, was adopted during the Reconstruction era. This gets us to the Rahimi case, which is, of course, the most recent U.S. Supreme Court decision. And it is an order of protection case. And what Rahimi says, I think, in total candor, is that the old prior, still on the books, Illinois statute concerning orders of protection and their effect on void cards, concealed carry licenses, is good law. That being that the trial court has to make factual findings of dangerousness with notice, so on and so forth. We're not contesting the old statute, still on the books. We're contesting the new statute that simply says any order of protection, no matter what it's based on, whether you've had notice or not, is sufficient to deprive you of your constitutional right to keep and bear arms. Even if that conduct is merely being irresponsible, which the U.S. Supreme Court in Rahimi said is not enough to revoke Second Amendment rights, even temporarily. Being irresponsible, in the words of the U.S. Supreme Court, whatever that means, their words, it has never been sufficient to diminish or revoke constitutional rights like the Second Amendment. And that's not to concede that my client, what he did or didn't do, was irresponsible. That's just saying, even if you consider what he may or may not have done, what he's accused of doing is being irresponsible. That's not enough. In order to satisfy the Second Amendment on orders of protection under Rahimi, there must be notice which the original order of protection, the only order of protection at issue in this case, had no notice to my client. You can look at the order of protection itself. It's clearly an ex parte emergency order of protection, which I know that Your Honors are familiar with. And there is no finding of dangerousness. In Mr. Rahimi's Supreme Court case, there was an express finding of dangerousness. And Mr. Rahimi was and probably still is dangerous, probably shouldn't have a firearm. Mr. Rahimi threatened to shoot people. My client is not alleged to have threatened to shoot anybody. Mr. Rahimi is found and apparently didn't dispute the fact that he actually did shoot at people. My client is not alleged to have done that. If you take the allegations as true, my client is simply alleged, quite candidly, to have yelled at his minor daughter over what he perceived as some misbehavior of his minor daughter at the time. Was it probably the best way to handle it? If it happened, perhaps not. But there's a dispute between a parent and their child and somebody being dangerous. I would ask that this Court reverse the summary judgment and send it back to the trial court for the trial court to perform simply a proper, brilliant analysis on the Second Amendment claim. The second issue is a Fifth Amendment claim, the right to avoid self-incrimination. The primary basis, when a void card is suspended, revoked, the state police sends a form that under the Illinois law is required to be filled out within 48 hours They list all the guns presently in your possession and tell us what you did with them. That's the crux of it. And then you're required to give that to law enforcement. Be it the Illinois State Police, your local police. Doesn't really matter, but people that arrest you for a living. Criminal enforcement officers. Well, when your void card is suspended, revoked, invalidated, under Illinois law, it is illegal to possess a firearm or ammunition. That means the moment your void card is revoked, that gun that you possess, you can't legally possess. And by having to fill out a form that says, yes, 10 seconds after my void card was revoked, I possess this firearm, you're admitting to a crime. Not necessarily under the statutes that require you to send in the form, but other criminal statutes, such as the ones that prohibit you from possessing firearms. The trial court, for its edification, pursuant to an argument of the state, found that, in the words of the trial court, even though there is no such expressed language in the statute, the trial court found the term used in the law court was a grace period, where a person could not be prosecuted for filling out that form. I would consider it a great victory if there was a published appellate decision that said a person had a grace period to fill out that form after their void card was revoked, where they couldn't be prosecuted for self-incrimination. But it's not in the statute anywhere. And even the trial court says it's not expressly in there. It's not implied in there. It doesn't exist. It probably ought to, but it is not the job of the courts, this court, the trial court, any other court, to invent or place language into statutes that the legislature either intentionally or inadvertently failed to include. You don't get to include. You add words. You don't get to delete words. That's the first place that the trial court erred on that point. The second point is that the trial court said, well, it's moot because he has his void card back. Well, while he had his void card back, there's nothing in the statute that said that getting your void card back immunizes you from being prosecuted for your conduct before you got your void card back. So that is a complete red herring. My client, 10 minutes after he got his void card back, could have been prosecuted by the state's attorney for not filling out that form, sending it in, and incriminating himself. That was not moot. And the trial court, accordingly, we would ask that Your Honor, for the reasons you set forth in our argument in the brief, again, reverse and remand the case back to the trial court, reversing the summary judgment and dismissal of the Fifth Amendment count. For further proceedings, explain to the court that, well, no, there isn't any sort of grace period, immunization period, period that the statute doesn't apply. Well, alternatively, if there is, again, that would be a great appellate win from my client's perspective that would protect the general public, but the language simply isn't in the statute. The defendant, for their purposes, has argued consistent with what the trial court ruled on, and then also argued mootness. But, of course, mootness was never raised in the trial court, and that would be waived. And it appears that my initial time period has expired, and I'm happy to readdress this court after the state has addressed you, unless you have any questions at this time. Thank you. Appellate, you may proceed. Please identify yourself for the record. Good afternoon, Your Honors. Counsel. Assistant Attorney General Carson Griffiths on behalf of the defendant. This court should affirm the circuit court's judgment for three reasons. First, as my friend acknowledged today, Mr. Huddleston is not raising any arguments as to his Second Amendment challenge to Section 8.2 of the Floyd-Carr Act, and so unless this court has any questions about that claim, I don't intend to address it further today. Second, Mr. Huddleston's Second Amendment claim to Section 70B of the Concealed Carry Licensing Act is moot, and, excuse me, mootness aside, failed on the merits. And third, Mr. Huddleston's self-incrimination claim as to Section 9.5A of the Floyd-Carr Act failed for lack of standing, for mootness, and on the merits. So turning first to Mr. Huddleston's Second Amendment challenge to Section 70B of the Concealed Carry Act. At the threshold, I want to emphasize that counsel suggested we waive mootness by not raising it below, but as we made clear in our brief, the Illinois Supreme Court has held that mootness is not an issue that can be waived. Justiciability is an issue that this court must raise sua sponte if the parties don't. That's the J.B. decision. So we haven't waived it by raising it on appeal here. Also, this claim is moot because, as Mr. Huddleston recognized, his concealed carry license was returned to him in November 2016. And as this court recognized in Kaczynski 1 and Kaczynski 2, that restoration mooted his claim that the temporary suspension of his concealed carry license was unconstitutional. Nor do any exceptions to mootness apply. At the threshold, I want to note here that a party seeking to avoid mootness bears the burden of showing that a mootness exception applies. That's in the Commonwealth Edison decision, the Illinois Supreme Court's most recent case to address the exceptions to mootness. Mr. Magg today did not address any exceptions to mootness, nor does his brief address any exceptions to mootness, and he did not file a reply brief in this case when we raised mootness in our response brief. So on that basis alone, this court should conclude that no mootness exception applies. He didn't bear that burden and should hold that it's moot consistent with his decision in Kaczynski 2. But even if this court were to address the mootness exceptions, the first one, the public interest exception, does not apply, because that requires a clear showing that the question presented is of a public nature, that an authoritative determination is necessary to guide public officers, and that the questions likely recur. But Mr. Huddleston's as-applied challenge did not raise the question of a public nature in this case, because it merely challenged the application of Section 70B to his particular facts and circumstances, not its effects on the public at large. And this is exactly what this court recognized in its recent decision in Kaczynski 2, holding that a very similar as-applied challenge to Section 70B did not raise an issue of public concern. Also, there's no need to issue an authoritative determination to guide public officers here. This criterion requires a showing that the law is in disarray, or that conflicting precedent exists. And again, in addressing a similar claim in Kaczynski 2, this court held that that criterion wasn't satisfied when it came to the constitutionality of Section 70B. And to the extent any guidance on that constitutionality was necessary at some point, the U.S. Supreme Court provided it in Rahimi, which I'll discuss when I reach the merits. As for the other two exceptions to mootness, capable of repetition yet evading review, there's nothing to suggest that Mr. Huddleston himself is likely to be subjected to another emergency order of protection that would result in the suspension of his concealed carry license. There was no evidence presented at summary judgment to that effect, and so that's purely speculative. As for the collateral consequences exception, there's no ongoing collateral consequences as a result of the past temporary deprivation of Mr. Huddleston's concealed carry license. This is not similar to a court order or a criminal conviction that continues to have lasting effects on somebody here. However, all those justiciality issues aside, the mootness problem, Mr. Huddleston's Second Amendment challenge, as to Section 70B, fail on the merits. In Rahimi, the Supreme Court of the United States held that a person found by a court to present a threat to others may be temporarily disarmed consistent with the Second Amendment. It did not, as counsel suggested today, say that notice and a hearing is required. It said, again, a court finding is the key to satisfying the Second Amendment. And here, the judge that entered the emergency order of protection heard evidence that Mr. Huddleston slammed his daughter against a car in a public parking lot, screamed at her, and slapped her hand. And based on that evidence, the court found Huddleston abused his daughter, ordered him to stay away from her, her school, and her mother's home, and most importantly, perhaps, found that there was good cause to enter that order ex parte because notifying Mr. Huddleston likely would lead to further abuse. That is exactly the same type of holding Rahimi suggested was essential, that he posed a credible threat to the physical safety of his daughter. So this is squarely within Rahimi's holding. And Mr. Huddleston's attempts to distinguish Rahimi fail. First, he argues that unlike the federal statute that he issued in Rahimi, the Illinois Domestic Violence Act does not require notice in a hearing before a temporary emergency order of protection can be entered. But that claim sounds in due process, not the Second Amendment. And Huddleston did not raise a due process claim in this case. Furthermore, Illinois courts have consistently held that ex parte emergency orders of protection do not violate due process so long as they are accompanied by affidavits showing exigent circumstances. And here, that's what we have again. It was a verified petition for an emergency order of protection submitted under oath, and the court found that that ex parte order was warranted. And furthermore, as I explained, nothing in Rahimi suggested that an opportunity to be heard was key to satisfying the Second Amendment. Again, a court finding is the key, which we have here. In his brief, Mr. Huddleston also undertakes some efforts to distinguish the facts of his case from Mr. Rahimi's case, noting that his alleged acts were less severe perhaps. But nothing in Rahimi said that the facts of the case before the U.S. Supreme Court were the bare minimum to satisfy the standard for temporary disarmament. The court did not say, unless someone acts like Zaki Rahimi, they can't be temporarily disarmed. Apart from Rahimi, Section 70B also passes the two-step Bruin analysis. At the first step, Mr. Huddleston should not be considered a law-abiding responsible citizen, which is the key to invoking the protection of the Second Amendment while that emergency order of protection was in effect during that period of time. And as the circuit court recognized in concluding that Mr. Huddleston didn't dispute the plain text, didn't apply to him in response to our motion for summary judgment, so he's forfeited that argument here. And in any event, even if the court were to conclude that at the first step, the Second Amendment's plain text applied to Mr. Huddleston, at the second step, as we spell out in our brief, the Section 70B is relevantly similar to historical surety and going armed laws in both why and how they burden the Second Amendment right here, any Second Amendment right you may have had. So this court should affirm summary judgment as a Second Amendment claim. Turning to Mr. Huddleston's claim that Section 9.5A and the requirement that he complete a firearm disposition record violated his right against self-incrimination, first, as the circuit court recognized, Mr. Huddleston lacked standing to pursue this claim. I'm not trying to quibble with my friend today. The court did not hold that the claim was moved. The court held that he lacked standing, which those are two distinct concepts, as Davis v. Yanchco, the Illinois Supreme Court, made clear. But the key for the circuit court's holding here is that Mr. Huddleston's FOID card was restored to him before he filed suit. And the suspension of a FOID card is necessary to trigger the requirements that he complete a firearm disposition record. In other words, once that suspension was over, Mr. Huddleston didn't have to fill out the form anymore because he could lawfully possess his guns. This places the claim, this claim, squarely within the holding of updates. The concealed carry, was that also restored before he filed suit? The concealed carry was not restored before he filed suit. It was restored about a month after he did. However, the firearm disposition record, the form he had to fill out, the suspension of a concealed carry license does not require him to fill out that form because you can still possess your firearms even if your concealed carry license is suspended. You can possess them in your home. You don't need to dispose of the firearms anywhere. So the firearm disposition record basically discloses, this is the person who's going to be holding my guns while my FOID card is suspended. So once Mr. Huddleston's FOID card was returned, he didn't have to fill out the form anymore. He didn't have to fill out the form before he filed suit in this case. There was no standing. That's exactly what the court held in Davis, where it held that the restoration of a FOID card prior to plaintiff's filing suit deprived him of standing to bring a claim for prospective injunctive relief. Mr. Huddleston's suggestion also that he had standing because he wanted to avoid a potential prosecution for not completing the form, fails for at least four reasons. First, he did not seek to enjoin a hypothetical prosecution in his self-incrimination claim, and the request for relief is to count two in his First Amendment complaint. And if he had, he waived any such request for relief in response to our motion to dismiss, saying I'm not trying to enjoin any potential prosecution here. Second, an injunction entered against the chief of the Firearms Services Bureau, the Illinois State Police, wouldn't redress any injury that Mr. Huddleston might have that's flowing from a prosecution because the Illinois State Police does not bring prosecutions against Mr. Huddleston. That prosecution would be initiated by the state's attorney's office. So enjoining the state police from prosecuting Mr. Huddleston would essentially have no effect on his alleged injury had he tried to avoid a prosecution. Third, the limitations period for any prosecution passed at the latest six years ago, more than six years ago, so he's under no threat of continued prosecution, and his request for prospective injunctive relief, again, wouldn't redress his injuries. And finally, any fear of a possible prosecution, leaving aside the limitations period's passing, was wholly speculative. There was no evidence that he actually faced a credible threat of prosecution for not filling out or filling out the form. The record is unclear as to whether he did or did not fill it out. But even if Mr. Huddleston had standing, his claim as to Section 9.58 also is new for many of the same reasons as the Second Amendment claim. And I don't intend to address those in detail. However, we lay those out in our brief, unless Your Honors have any questions about why it's also moot, in addition to there being a lack of standing. And again, I want to emphasize briefly on the mootness point before I move on. That's not an issue that's capable of waiver. So to the extent he suggests, we waived it by not raising it. And I believe we did raise mootness as to the self-incrimination claim. It's just really not an issue this Court needs to take up. Finally, on the merits, however, if we leave aside all those justiciability problems, Mr. Huddleston is just incorrect that Section 9.58 required him to disclose incriminating information. The right against self-incrimination is violated only when the government seeks to compel testimony which would subject an individual to criminal liability. But Section 9.58 did not require Mr. Huddleston to admit that he was in possession of a FOIA card when it was suspended. Contrary to counsel's argument today, the statutory language does not say that you must disclose all firearms presently in your possession. Rather, it merely required disclosure of the firearms location at the time the form was completed, which if Mr. Huddleston had complied with Section 9.58's other requirement that he disclose his firearms, would have revealed evidence that they were not in his possession at that time. Nor did the form say, disclose the date on which you expectuated his transfer, which might suggest there was a period of time between the suspension and the filling out of the form in which Mr. Huddleston had those firearms on him. So there's really no evidence of Mr. Huddleston being exposed to potential criminal liability here. Even if there were, however, there's another fundamental problem with Mr. Huddleston's self-incrimination claim, and that is he offered no evidence that he invoked that right. The right against self-incrimination is not self-executing. A party is timely invoking. Mr. Huddleston presented no evidence at summary judgment, no declaration or anything else suggesting that in response to receiving the firearm disposition record, he invoked his right against self-incrimination or did it at any point in the proceedings. So this Court can dispose of his claim on that basis as well. I also briefly want to address the Haines and Marchetti decisions that Mr. Huddleston cites in his brief on the self-incrimination issue. Both of those cases involved disclosures to the federal government that when made would immediately and necessarily subject someone to criminal liability. So in Haines, the person was charged with failing to register a firearm that he had otherwise illegally procured. So by reporting, I illegally procured this firearm to the federal government, he was admitting criminal liability. Marchetti similarly also was a requirement that certain operators of gambling facilities report their income and their activities to the federal government, which would subject them to prosecution under various federal and state laws prohibiting gambling. So that's a far cry from the situation we have here where the firearm disposition record, again, just asks, where are the firearms now, not when did you transfer them and did you have them in your possession after your FOIA card was suspended? So unless this court has any questions, for those reasons and the reasons stated in our brief, we ask that you affirm the circuit court's judgment. Thank you. Thank you, Your Honor. Your Honor. The actual form, Illinois State Police firearms disposition record, is in the records attached to plaintiff's brief in Appendix 6. It's otherwise in the record at C-137. In reading, it says, please list all the firearms within your possession at the time of revocation, indicating that they have been secured, transferred, so on and so forth. I don't know how counsel interprets that language, but it's pretty clear to me that they're asking about firearms in my client's possession at the time that his FOIA card was revoked, which would be an admission that he possessed them at that time. Otherwise, they wouldn't be in his possession. Counsel addressed the Haynes-Machete indecisions. They're part of a triumvirate of Supreme Court decisions back in 1968, maybe 1967 for the first, but Haynes was 1968. Haynes declared the original Federal National Firearms Act, at least much of it unconstitutional until it was amended later, because of the Fifth Amendment. And in that case, if you read the decision, the federal government conceded that there were situations where persons could come into possession of unregistered machine guns, sawed-off shotguns, other regulated under that statute items, in a completely legal way. For instance, maybe they weren't originally registered in the first place. The statute didn't come into effect until 1934. Or maybe they were simply found abandoned in a house. And then, under the statute at the time, the person that found them would be obliged to register them, having committed no crime. On the other hand, as counsel noted, most of the time they would have come into possession of an unregistered firearm, as defined under the statute then, through illegal means. The U.S. Supreme Court made crystal clear that a person unlawfully possessing a firearm cannot be compelled to disclose that fact to the governmental entity, as explained later in the Freed case in 1972, unless there's some sort of immunity granted. And there's no immunity here. There's no grace period. It's tell us what you got, and trust that we probably won't prosecute you, but maybe we will if we want to. We promise not to do that. There's never been an adequate guarantee of any sort of protected rights. And as far as the order of protection, finding that Mr. Huddleston is dangerous, the order of protection is also in the record. I would encourage the court to look at it. See 324 and the various pages after that. There's a place in there where the trial court could have made the factual findings consistent with Brahimi. It didn't do so. There is nothing in there that says that the trial court found, the OP trial court, found that my client was dangerous, or got noticed, or any of that. As noted in Brahimi, even if counsel is correct that my client wasn't responsible, in the words of the U.S. Supreme Court, whatever that means, the Rubichini court, the U.S. Supreme Court, makes sure that that's not enough to deprive somebody of their Second Amendment rights. As far as mootness goes, this court got it right in Kaczynski 1. What counsel is referring to as Kaczynski 2 is an unpublished Rule 23 order that, frankly, the case isn't even old again in that. But as I read Rule 23, it's not to be cited except for persuasive purposes. Well, it appears to be cited for more than persuasive purposes. I ask that the court not consider it for more than it's worth, noting that it's not published, and that case isn't over yet. But more importantly, I think it's wrong. A statute could be broadly unconstitutional and still be constitutional in some rare circumstance, which would fall under, yeah, it's not facially unconstitutional, it's only unconstitutional 99.999% of the time, which makes it an as-applied challenge. In this case, the as-applied challenge, to the extent that it is, is so broad that there's probably not a person subject to an order of protection in the state of Illinois that would fall into the Rahimi findings because the courts don't make them in Illinois anymore because the new statute makes it moot. If this court struck the new statute, presumably we'd go back and the individual trial courts would be making the proper findings under Rahimi, and I see that I'm out of time unless you have any questions. Any further questions? No questions. Thank you. Counsel. Thank you for your arguments. We will take this matter under advisement and issue a ruling in due course.